IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

**NATIONAL PUBLIC RADIO, INC.**,
    1111 N. Capitol St. NE
    Washington, D.C. 20002

        **Plaintiff**,

    **v.**

**HON. GLENN L. KLAVANS**,
    8 Church Circle
    Annapolis, MD 21401

**HON. FRED S. HECKER,**
    Courthouse Square, 200 Willis Street,
    Westminster, MD 21157

        **Defendants**.

Civil Action No. 21-cv-2247

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Charles Tobin (Bar No. 15919)
Maxwell S. Mishkin (Bar No. 20650)
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: 202.661.2200
Facsimile: 202.661.2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

Leslie Minora (*pro hac vice* motion to be filed)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999
minoral@ballardspahr.com

*Attorneys for National Public Radio, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 2

A.   The Parties ........................................................................................................... 2

B.   Background on Official Court Recordings in Maryland ...................................... 2

C.   The Challenged Ban on Broadcasting Criminal Trial Court Proceedings ........... 3

D.   The *Capital Gazette* Shooting ............................................................................. 4

E.   The Broadcast Ban's Impact on NPR's Reporting .............................................. 5

F.   The *Soderberg v. Carrion* Litigation ................................................................. 6

G.   NPR's Letter to the Office of the Maryland Attorney General ........................... 6

ARGUMENT ...................................................................................................................... 7

I.   NPR Is Likely to Succeed on the Merits of Its Challenge to the
     Broadcast Ban ...................................................................................................... 8

     A.   The Broadcast Ban is Unconstitutional Under the First and
          Fourteenth Amendments .......................................................................... 8

          1.   The Broadcast Ban Punishes Protected Speech ........................... 8

          2.   The Broadcast Ban Cannot Withstand Strict Scrutiny ............... 13

II.   NPR Satisfies All of the Other Factors Warranting Preliminary
      Injunctive Relief ................................................................................................ 16

CONCLUSION ................................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*Ashcraft v. Conoco, Inc.*,
   218 F.3d 288 (4th Cir. 2000) .................................................................10, 11, 15

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001).........................................................................................8, 13

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011)............................................................................................13

*Chandler v. Florida*,
   449 U.S. 560 (1981)......................................................................................14, 15

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975).................................................................................. *passim*

*Doe v. Pittsylvania Cnty., Va.*,
   842 F. Supp. 2d 927 (W.D. Va. 2012) ..................................................................18

*Elrod v. Burns*,
   427 U.S. 347 (1976)............................................................................................17

*Fla. Star v. B.J.F.*,
   491 U.S. 524 (1989)................................................................................... *passim*

*Frisby v. Schultz*,
   487 U.S. 474 (1988)............................................................................................13

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ........................................................................17, 18

*Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.*,
   879 F.3d 101 (4th Cir. 2018) ..............................................................................13

*Hassay v. Mayor & City Council of Ocean City, Md.*,
   955 F. Supp. 2d 505 (D. Md. 2013) .....................................................................18

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
   174 F.3d 411 (4th Cir. 1999) ..............................................................................18

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ........................................................................17, 18

*Newsom v. Albemarle Cnty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) ........................................................................17, 18

*Ostergren v. Cuccinelli,*
   615 F.3d 263 (4th Cir. 2010) ...........................................................16

*Pashby v. Delia,*
   709 F.3d 307 (4th Cir. 2013) ...........................................................18

*Planned Parenthood of Cent. N.C. v. Cansler,*
   804 F. Supp. 2d 482 (M.D.N.C. 2011) ...........................................18

*Reed v. Town of Gilbert,*
   575 U.S. 155 (2015)..........................................................................13

*Rossignol v. Voorhar,*
   316 F.3d 516 (4th Cir. 2003) ...........................................................17

*Smith v. Daily Mail Publ'g Co.,*
   443 U.S. 97 (1979).....................................................................*passim*

*Soderberg v. Carrion,*
   999 F.3d 962 (4th Cir. 2021) .....................................................*passim*

*Wash. Post v. McManus,*
   944 F.3d 506 (4th Cir. 2019) ......................................................13, 14

*Winter v. Natural Res. Def. Council,*
   555 U.S. 7 (2008)..........................................................................7, 16

**Statutes**

Ga. Code Ann. § 26-9901 (1972)...........................................................9

Md. Code Ann., Crim. Proc. § 1-201 ..............................................*passim*

**Other Authorities**

Fed. R. Civ. P. 65 ....................................................................................1

Md. Rule 16-502 .................................................................................2, 3

Md. Rule 16-503 .................................................................................2, 3

Md. Rule 16-504 .........................................................................*passim*

U.S. Const. amend. I ...................................................................*passim*

U.S. Const. amend. XIV .............................................................*passim*

## PRELIMINARY STATEMENT

Plaintiff National Public Radio, Inc. ("NPR") seeks to protect its constitutional right to publish lawfully obtained recordings from one of the most significant criminal proceedings in Maryland history: the trial of Jarrod Ramos, who murdered five journalists in the offices of the *Capital Gazette*. NPR intends to publish these recordings in an upcoming episode of its award-winning podcast, *Embedded*, that will provide in-depth coverage of Ramos's brutal crime and subsequent trial. That episode is slated for release on or after September 30, 2021, after Ramos's sentencing concludes.[1]

In this action, NPR is challenging the provision of a Maryland law that forbids anyone, including the press, from broadcasting lawfully-obtained official court recordings of state criminal court proceedings, and provides that violators may be held in contempt of court (the "Broadcast Ban"). Md. Code Ann., Crim. Proc. § 1-201(a), (c). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, NPR respectfully moves this Court for a preliminary injunction prohibiting enforcement of the Broadcast Ban against it for its upcoming use of the recordings of Ramos's criminal proceedings. As set forth in detail below, the Broadcast Ban is unconstitutional under the First and Fourteenth Amendments to the United States Constitution because it punishes the broadcasting of lawfully-obtained official court records, which are available to the general public, and it cannot withstand strict scrutiny. For these reasons, and because the Broadcast Ban imposes an immediate and irreparable harm to NPR's constitutional rights and thus impacts the listening public in Maryland and across the country, a preliminary injunction barring enforcement of the Broadcast Ban is necessary in these circumstances.

---

[1] Ramos's sentencing hearing is currently scheduled for September 28, 2021. Compl. ¶ 25.

1

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff NPR is a non-profit multimedia organization organized under the laws of the District of Columbia with its principal place of business in Washington, D.C.  Compl. ¶ 7.  It is the leading provider of non-commercial news, information and entertainment programming to the American public.  *Id.*  NPR's fact-based, independent journalism helps the public stay on top of breaking news, follow the most critical stories of the day, and track complex issues over the long term.  *Id.*  NPR reaches approximately sixty million people on broadcast radio, podcasts, NPR apps, NPR.org, and YouTube video content each week.  *Id.*  NPR distributes its radio broadcasts through more than 1,000 non-commercial, independently operated radio stations, licensed to more than 250 NPR members and numerous other NPR-affiliated entities.  *Id.*

Defendant Hon. Glenn L. Klavans is the Administrative Judge of the Circuit Court for Anne Arundel County.  *Id.* ¶ 8.  Defendant Hon. Fred S. Hecker is the Administrative Judge for the Fifth Judicial Circuit, which includes Anne Arundel County.  *Id.* ¶ 9.  Both Judges are responsible for handling contempt proceedings under the Broadcast Ban, and both are sued in their official capacity.  *Id.* ¶ 8-9.

### B.    Background on Official Court Recordings in Maryland

The Maryland Rules regarding Court Administration set forth a broad requirement mandating the official recording of state trial court proceedings "verbatim in their entirety."  *Id.* ¶ 13 (quoting Md. Rule 16-502 (requiring electronic recordings of district court proceedings); Md. Rule 16-503 (same for circuit courts)).  These Rules apply to "[a]ll trials, hearings, testimony, and other judicial proceedings" that are "held either in a courtroom or by remote electronic means."  *Id.* (quoting Md. Rules 16-502 & 16-503).

Members of the public have the right to obtain copies of the recordings made pursuant to Rules 16-502 and 16-503, save for limited exceptions that are not relevant to this action.  *Id.* ¶ 14 (citing Md. Rule 16-504(h)(1) (mandating public access and noting certain limited exceptions), *id.* (h)(3) (noting limited exceptions)).  Specifically, Rule 16-504(h)(1) provides:

> Except (A) for proceedings closed pursuant to law, (B) as otherwise provided in this Rule, or (C) as ordered by the court, the authorized custodian of an audio recording shall make a copy of the audio recording or, if practicable, the audio portion of an audio-video recording, available to any person upon written request and, unless waived by the court, upon payment of the reasonable costs of making the copy.

*Id.* ¶ 14.  Rule 16-504(h)(1) thus provides a right for any member of the public, including members of the press, to obtain official recordings of state court proceedings.  *Id.* ¶ 15.

**C.      The Challenged Ban on Broadcasting Criminal Trial Court Proceedings**

Section 1-201 of the Criminal Procedure Article of the Maryland Code bans recording or broadcasting criminal matters held in a trial court or before a grand jury.  It reads as follows:

**§ 1-201. Recording or broadcasting criminal proceedings**

**(a) Prohibited. --**

> **(1)** Except as provided in subsection (b) of this section, a person may not record or broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury.

> **(2)** This prohibition applies to the use of television, radio, and photographic or recording equipment.

**(b) Exceptions. --** Subsection (a) of this section does not apply to the use of electronic or photographic equipment approved by the court:

> **(1)** to take the testimony of a child victim under § 11-303 of this article; or

> **(2)** to perpetuate a court record.

**(c) Penalty. --** A person who violates this section may be held in contempt of court.

*Id.* ¶ 16 (quoting Md. Code Ann., Crim. Proc. § 1-201).[2]

As relevant to this action, this provision forbids anyone, including the press, from broadcasting official court recordings of state criminal court proceedings – recordings that were lawfully obtained from the court itself pursuant to Rule 16-504(h)(1).  *Id.* ¶ 17.

The Broadcast Ban provides that violators may be held in contempt of court.  *Id.* ¶ 18 (citing Md. Code Ann., Crim. Proc. § 1-201(a) ("[A] person may not . . . broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court . . . ."); *id.* § 1-201(c) ("A person who violates this section may be held in contempt of court.")).  The Broadcast Ban therefore punishes the dissemination of recordings of criminal trial court proceedings that the State itself distributes and makes publicly available.  *Id.* ¶ 19.

Although the Broadcast Ban prohibits the broadcasting of lawfully-obtained recordings of *criminal trial court* proceedings, "[p]eople are free . . . to broadcast official court recordings of state civil proceedings, as well as recordings of state appellate proceedings in both civil and criminal cases."  *Id.* ¶ 20 (quoting *Soderberg*, 999 F.3d at 965).

### D.      The *Capital Gazette* Shooting

On June 28, 2018, Jarrod Ramos entered the offices of the *Capital Gazette* newspaper in Annapolis, Maryland, and murdered five journalists.  *Id.* ¶ 21.  According to the Pulitzer Prize Board, which issued a Special Citation in 2009 "to honor the journalists, staff and editorial board of the Capital Gazette," the shooting was "the largest killing of journalists in U.S. history."  *Id.* ¶ 22 (citing https://www.pulitzer.org/winners/capital-gazette-annapolis-md).

---

[2] The Maryland General Assembly enacted the Broadcast Ban in 1981, as article 27, section 467B of the Maryland Code, and it was re-codified in 2001 "without substantive change" in Section 1-201.  *Soderberg v. Carrion*, 999 F.3d 962, 964 (4th Cir. 2021).

The State subsequently charged Ramos with five counts of murder, one count of attempted murder, six counts of assault, and eleven counts of illegal use of a firearm.  *Id.* ¶ 23. Ramos pleaded guilty but not criminally responsible, and after a two-week trial in July 2021, a jury rejected that mental illness plea.  *Id.* ¶ 24.  Ramos is presently scheduled to be sentenced on September 28, 2021.  *Id.* ¶ 25.

**E.      The Broadcast Ban's Impact on NPR's Reporting**

NPR publishes its news reports via radio, podcasts, apps, and its website, primarily through audio storytelling.  *Id.* ¶ 26.  The NPR podcast *Embedded* provides deep-dive coverage of stories that have made news.  *Id.* ¶ 27.  Its host, Kelly McEvers, is a two-time Peabody Award-winning journalist and former host of NPR's popular, longstanding news radio program, *All Things Considered*.  *Id.*; Decl. of Kelly McEvers ("McEvers Decl.") ¶ 1.

NPR intends to publish excerpts from audio recordings of the trial court proceedings in *State v. Ramos*—recordings that NPR lawfully obtained pursuant to Rule 16-504(h)(1)—in an upcoming episode of *Embedded*, which will provide in-depth coverage of Ramos's brutal crime and subsequent trial.  Compl. ¶¶ 28-29; McEvers Decl. ¶¶ 3-4; Decl. of Chris Benderev ("Benderev Decl.") ¶¶ 4-6.  NPR may also publish excerpts of the recordings in its other radio journalism.  Compl. ¶ 28; McEvers Decl. ¶ 7.  NPR is currently scheduled to release this *Embedded* episode on or after September 30, 2021—after Ramos's sentencing, which is currently scheduled for September 28, 2021.  Compl. ¶¶ 25, 29; McEvers Decl. ¶ 3.

The Broadcast Ban prohibits NPR from publishing excerpts from lawfully-obtained, publicly available, state-mandated, and state-provided audio recordings of Ramos's trial court proceedings.  Compl. ¶ 30.  NPR therefore finds itself in the untenable position of either using the recordings in its coverage while facing the risk of being held in contempt of court, or

refraining from using the recordings solely out of fear that it, or one of its journalists, may be held in contempt of court. *Id.*; McEvers Decl. ¶ 9.  The Broadcast Ban thus imposes a substantial and unconstitutional burden on NPR's ability to freely report the news and convey stories to its listeners by way of its audio journalism.

**F.    The *Soderberg v. Carrion* Litigation**

The U.S. Court of Appeals for the Fourth Circuit recently addressed a challenge to the Broadcast Ban that is nearly identical to the one NPR brings here. *Id.* ¶ 31.  The Fourth Circuit vacated the District Court's dismissal of the claim, concluding that the District Court had erroneously applied intermediate scrutiny, and remanded the case for the District Court to apply strict scrutiny. *Id.* ¶ 31 (citing *Soderberg*, 999 F.2d at 969-70 (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) and *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979))).  The Fourth Circuit explained that the District Court's ruling "erroneously treated the Broadcast Ban as a content-neutral time, place, and manner regulation and thus subjected it to intermediate scrutiny." *Id.* (citing *Soderberg*, 999 F.2d at 970).  The *Soderberg* case remains pending on remand. *Id.*

**G.    NPR's Letter to the Office of the Maryland Attorney General**

On August 23, 2021, in an effort to avoid the need to seek the protection of this Court, NPR submitted a letter, through counsel, to the Office of the Maryland Attorney General to explain that "NPR intends to use excerpts from a lawfully-obtained audio recording of trial proceedings from *State of Maryland v. Jarrod Ramos*, Case No. C-02-CR-18-001515," and to "respectfully request that the State commit not to seek sanctions against NPR for this reporting in the public interest." *Id.* ¶ 32; Compl. Ex. A.  NPR's letter further stated:

> In [*Soderberg*], your office asserted that Section 1-201 "is moribund" because "there has never been a § 1-201 contempt proceeding against *anyone*." State's

Mem. in Supp. of its Mot. to Dismiss at 8-11, *Soderberg v. Pierson*, No. 19-cv-1559-RDB (D. Md. July 18, 2019), Dkt. 23-1 (emphasis in original). Indeed, your office argued that those plaintiffs could not even *challenge* the law in court because "[t]he supposition that, after 38 years, these plaintiffs will be the first-ever alleged contemnors in a § 1-201 contempt proceeding is mere speculation." *Id.* at 11. The State has therefore already recognized that while Section 1-201 technically remains on the books, it no longer has any force or effect.

NPR requested a response from the Office of the Maryland Attorney General by Thursday, August 26, 2021.  Compl. ¶ 34.  At the Attorney General's request, NPR agreed to an extension to await a response on Tuesday, August 31, 2021.  *Id.*

On August 31, 2021, the Attorney General's Office responded by letter and refused to commit not to enforce the Broadcast Ban against NPR for publishing the recordings of *State v. Ramos*.  *See* Compl. ¶ 35 & Ex. B.  It stated that "[i]t would not be appropriate for the State to commit in advance to not take enforcement action for a hypothetical violation of the law that has not yet occurred," and that "the Circuit Court for Anne Arundel County cannot opine on the prospective application of the law to NPR's intention to broadcast the *Ramos* audio recordings." *Id.* ¶ 35 & Ex. B at 1-2.

Because of the Office of the Maryland Attorney General's position as expressed in its letter, NPR remains concerned that it may be subject to contempt proceedings under Section 1-201 and therefore requires the protection of this Court.  *Id.* ¶ 36.

## ARGUMENT

Preliminary injunctive relief is warranted where, as here, the moving party can show: (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in its favor, and (4) that granting an injunction would be in the public interest.  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

**I.       NPR Is Likely to Succeed on the Merits of Its Challenge to the Broadcast Ban**

**A.       The Broadcast Ban is Unconstitutional Under the First and Fourteenth Amendments**

Under well-established Supreme Court precedent, if a news outlet "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Fla. Star v. B.J.F.*, 491 U.S. 524, 533 (1989) (quoting *Daily Mail*, 443 U.S. at 103).  This principle has its strongest application when the information to be published is public by its nature, such as court records.  *Cox*, 420 U.S. at 496 ("[T]he First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records.").

Here, NPR intends to publish excerpts from lawfully-obtained audio recordings of criminal proceedings in *State v. Ramos*, but the Broadcast Ban provides that NPR can be held in contempt of court for doing exactly that.  As applied to NPR's upcoming publication, therefore, this provision violates the First Amendment.

**1.       The Broadcast Ban Punishes Protected Speech**

"As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quoting *Daily Mail*, 443 U.S. at 102).  Here, the Broadcast Ban forbids anyone, including the press, from broadcasting official court recordings of state criminal court proceedings that were lawfully obtained from the court itself pursuant to Rule 16-504(h)(1), and establishes that violators may be held in contempt of court.  *See* Md. Code Ann., Crim. Proc. § 1-201(a) ("[A] person may not . . . broadcast any criminal matter, including a trial, hearing, motion, or

8

argument, that is held in trial court . . . ."); *id.* § 1-201(c) ("A person who violates this section may be held in contempt of court.").

The Supreme Court held a similar law unconstitutional in *Cox.*  In that case, the press reported on the rape and death of the plaintiff's daughter and the subsequent court proceedings against six youths, and, for a time, the press did not disclose the victim's identity.  *Cox*, 420 U.S. at 471-72.  A television reporter who attended the court proceedings learned of the victim's name, however, when he reviewed indictments that "were made available for his inspection in the courtroom" and that "were public records."  *Id.* at 472-73.  That reporter subsequently mentioned the victim's name in a television news broadcast about the court proceedings.  *Id.* at 473.  The victim's father responded by initiating a lawsuit under a provision of Georgia law that made it "a misdemeanor to publish or broadcast the name or identity of a rape victim."  *Id.* at 471-72, 474 (citing Ga. Code Ann. § 26-9901 (1972)).  In analyzing that statute under the First Amendment, the Court observed:

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*Id.* at 495.

The Court went on to note that any rule forbidding the publication of records that the government makes available to the media "would invite timidity and self-censorship and very likely lead to the suppression of many items that would otherwise be published and that should be made available to the public."  *Id.* at 496.  "At the very least, the First and Fourteenth

9

Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Id.*

In a subsequent line of cases, the Supreme Court built upon its reasoning in *Cox*, and four years later, it pronounced the rule that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Daily Mail*, 443 U.S. at 103, 105-06 (holding that the state cannot constitutionally "punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper").

The Court again analyzed and distilled the *Daily Mail* rule in *Florida Star*. There, a newspaper had printed the full name of a sexual assault victim that it learned through information provided by authorities to the media, in violation of a Florida law prohibiting the publication of names of victims of sexual offenses. *Fla. Star*, 491 U.S. at 526, 533. The Court held that the Florida law was unconstitutional under the First Amendment because it punished the publication of lawfully-obtained, truthful information and was not "narrowly tailored to a state interest of the highest order." *Id.* at 541. In the course of its analysis, the Court focused on three considerations from its own precedent.

First, the Court observed that "because the *Daily Mail* formulation only protects the publication of information which a newspaper has 'lawfully obtain[ed],' the government retains ample means of safeguarding significant interests upon which publication may impinge." *Id.* at 534 (citation omitted). In other words, information that the government holds close, and that is not made available to the public, would not be implicated by the press's freedom to publish lawfully-obtained, truthful information. *Id.*; *cf. Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 303 (4th

Cir. 2000) ("No citizen is responsible, upon pain of criminal and civil sanction, for ensuring that the internal procedures designed to protect the legitimate confidences of government are respected.").

Second, the Court noted "that punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." 491 U.S. at 535. The Court further recognized that "where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." *Id.*

Third, the Court acknowledged the "'timidity and self-censorship' which may result from allowing the media to be punished for publishing certain truthful information." *Id.* (quoting *Cox*, 420 U.S. at 496). As the Court explained, "[a] contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." *Id.* at 536.

Each of these considerations controls here as well. First, it is indisputable that NPR lawfully obtained recordings of Ramos's criminal trial court proceedings from the court itself, Compl. ¶ 28; McEvers Decl. ¶ 4; Benderev Decl. ¶¶ 4-6, and that the court had "ample means" of keeping these recordings confidential if it actually had reason to do so. *See Fla. Star*, 491 U.S. at 534; *see also, e.g.,* Md. Rule 16-504(h)(1) (mandating public access and providing exceptions); *id.* 16-504(h)(3) (providing exceptions to public access); *cf. Ashcraft*, 218 F.3d at 303. Second, as in *Florida Star*, "punishing [NPR] for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." 491 U.S. at 535. There is no government interest to justify stymying the

publication of recordings that the government itself has chosen to make publicly available and that memorialize proceedings that took place in open court.  Third, the Broadcast Ban forces NPR to choose between publishing lawfully-obtained criminal trial court recordings while risking being held in contempt of court, or refraining from publishing those recordings for fear of being held in contempt.  *See* McEvers Decl. ¶ 9.  By its very nature and existence, the Broadcast Ban invites "timidity and self-censorship" and puts the onus on the press to determine whether information it lawfully obtained from the government may, in turn, be lawfully published or broadcast.  *Fla. Star*, 491 U.S. at 535.

The threat of NPR being held in contempt of court for broadcasting lawfully-obtained recordings on matters of public concern is particularly egregious because the public depends so heavily upon the press to gather information about the actions of its government.  As the Supreme Court noted, "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring him in convenient form the facts of those operations."  *Cox*, 420 U.S. at 491.  This public reliance on the press is especially important with respect to noteworthy court proceedings, such as the Ramos trial, where "the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."  *Id.* at 492.

For all these reasons, NPR's publishing of excerpts of lawfully-obtained recordings of Ramos's criminal trial court proceedings should receive exactly the same robust level of First Amendment protections that the Supreme Court has set forth in *Florida Star* and its progeny.

## 2.        The Broadcast Ban Cannot Withstand Strict Scrutiny

The Fourth Circuit, applying the line of Supreme Court case law discussed above, recently held that the Broadcast Ban is subject to strict scrutiny because it penalizes broadcasting "information released to the public in official court records." *Soderberg*, 999 F.3d at 964, 968-70 (remanding to the District Court for application of strict scrutiny) (case pending on remand). As the Fourth Circuit instructed, "the broadcasting of those lawfully obtained recordings cannot constitutionally be punished 'absent a need to further a state interest of the highest order.'" *Id.* at 969 (quoting *Daily Mail*, 433 U.S. at 103).

Because the Broadcast Ban is subject to strict-scrutiny review, the State bears the burden of demonstrating that it "furthers a compelling interest," is "narrowly tailored to achieve that interest," and that there are no less restrictive alternatives to accomplish that purpose. *Reed v. Town of Gilbert*, 575 U.S. 155, 171 (2015).  "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.*, 879 F.3d 101, 111 (4th Cir. 2018) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).  Thus, to satisfy strict-scrutiny review, the government "must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citations omitted).  In other words, when free speech values are at stake, the government must set forth an interest that is "far stronger than mere speculation about serious harms." *Wash. Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019) (quoting *Bartnicki*, 532 U.S. at 531); *see also id.* ("The First Amendment does not permit states to broadly conjure hypotheticals in support of expressive burdens.  If any evidence—no matter how indirect

13

or futuristic—could concretize a purported harm, speech would be rendered substantially more vulnerable.").

The government's Fourth Circuit briefing in *Soderberg* presented no argument that would overcome the strict-scrutiny standard.  *See id.* at 520 (noting that "strict scrutiny, in practice, is virtually impossible to satisfy").  Within its unsuccessful argument that the court should apply intermediate scrutiny to the Broadcast Ban, the government argued that the conduct prohibited by the Ban (and the conduct of broadcasting trial proceedings in general) broadly presents a "threat" to fair trials, including because "neither the jury nor the judge benefits from broadcasting," because the purpose of a trial is not entertainment, and because broadcasting could contribute to prejudicing witness' testimony.  Appellees' Br., *Soderberg v. Carrion*, No. 20-1094 (4th Cir. June 5, 2020) (Dkt. 48) at 20-23.  The government, reversing the notion that high-profile cases warrant the greatest public scrutiny, concluded that "in cases with the highest stakes, the fairness-depriving effect of broadcasting on jurors and witnesses is at its apex, and broadcasting will happen most often in cases with the highest stakes."  *Id.* at 23.

The government's purported interest is far too speculative to satisfy strict scrutiny. Generalized fair trial concerns plainly cannot justify an all-encompassing ban on the broadcasting of *all* criminal proceedings, especially where such concerns are rooted in an unsupported fear that broadcast news coverage, as a concept, will sensationalize criminal trial proceedings and prejudice or intimidate jurors and witnesses.  The "appropriate safeguard" against this concern is a defendant's right to demonstrate that *their own case* has been prejudiced and to seek appropriate relief.  *See Chandler v. Florida*, 449 U.S. 560, 574-575 (1981).  In *Chandler*, the Supreme Court stated:

> An absolute constitutional ban on broadcast coverage of trials cannot be
> justified simply because there is a danger that, in some cases, prejudicial

14

> broadcast accounts of pretrial and trial events may impair the ability of jurors
> to decide the issue of guilt or innocence uninfluenced by extraneous matter.
> The risk of juror prejudice in some cases does not justify an absolute ban on
> news coverage of trials by the printed media; so also the risk of such prejudice
> does not warrant an absolute constitutional ban on all broadcast coverage.

*Id.*  Such concerns bear even less force where, as here, the provision at issue bans the

dissemination of materials that the government itself has made public.  *See Fla. Star*, 491 U.S. at

535 ("[I]t is a limited set of cases indeed where, despite the accessibility of the public to certain

information, a meaningful public interest is served by restricting its further release.").

While of course the public and the parties in general have an interest in the fairness of

criminal trials, this generalized concern does not rise to the level of a "compelling" interest

warranting the ban.  *See Chandler*, 449 U.S. at 574-75.  Indeed, press coverage of criminal trial

proceedings actually furthers this interest.  *Cox*, 420 U.S. at 492 ("[T]he function of the press

serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public

scrutiny upon the administration of justice.").

Even if the interests as the government articulates them were compelling, the Broadcast

Ban is not narrowly tailored to serve those interests.  Maryland itself makes recordings of trial

court proceedings available to the public, and the Supreme Court has made it clear that when

"the government has failed to police itself in disseminating information, . . . the imposition of

damages against the press for its subsequent publication can hardly be said to be a narrowly

tailored means of safeguarding [the state's asserted interest]."  *Fla. Star*, 491 U.S. at 538; *cf.*

*Ashcraft*, 218 F.3d at 303 ("No citizen is responsible, upon pain of criminal and civil sanction,

for ensuring that the internal procedures designed to protect the legitimate confidences of

government are respected.").  Here, as in *Florida Star*, the government has "ample means" of

keeping court proceedings confidential where it has reasons recognized under the law for doing

so.  *See* 491 U.S. at 534; *see also, e.g.,* Md. Rule 16-504(h)(1) (mandating public access and

15

providing exceptions); *id.* 16-504(h)(3) (providing exceptions to public access).  Indeed, the recordings at issue here document *public* trial proceedings, and the state of Maryland and its courts *purposefully made them available* to NPR.  *Cf. Cox*, 420 U.S. at 495 ("By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served.").

The Supreme Court has expressly stated that "[t]he First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records."  *Id.* at 496.  Citing that clear holding "and its progeny," the Fourth Circuit has explained that "punishing truthful publication of private information will almost never be narrowly tailored to safeguard privacy when the government itself released that information to the press."  *Ostergren v. Cuccinelli*, 615 F.3d 263, 280 (4th Cir. 2010).  Because the Broadcast Ban's burden on speech is significant and wholly unjustified, and because it is not narrowly tailored to advance any compelling state interest, the Ban cannot satisfy strict scrutiny and this Court should enjoin its enforcement against NPR.

## II.    NPR Satisfies All of the Other Factors Warranting Preliminary Injunctive Relief

The remaining requirements for entitlement to preliminary injunctive relief are all met as well.  To demonstrate that preliminary injunctive relief is warranted, a party must show, in addition to a likelihood of success on the merits, that it is likely to suffer irreparable harm in the absence of such relief, that the balance of equities tips in its favor, and that granting an injunction would be in the public interest.  *Winter*, 555 U.S. at 20.  Under the present circumstances, satisfaction of these remaining factors follows naturally from the fact that the Broadcast Ban imposes requirements that violate the First Amendment.

First, the Fourth Circuit presumes irreparable injury where, as here, a plaintiff has demonstrated a substantial likelihood of success on the merits of its First Amendment claims.

Indeed, "it is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (holding that permanent injunction was properly granted, and concluding that irreparable injury could be presumed based on finding that statutory scheme violated First Amendment); *see also Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (holding that it was an abuse of discretion not to issue preliminary injunction because regulations at issue violated First Amendment, and irreparable harm could therefore be presumed); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (affirming grant of preliminary injunction and presuming irreparable harm based on finding that statute violated First Amendment).  That is because "the inherently communicative purpose of First Amendment activity" makes after-the-fact monetary compensation "legally insufficient as a remedy." *Rossignol v. Voorhar*, 316 F.3d 516, 522 (4th Cir. 2003).

Second, the balance of equities tips decisively in NPR's favor, particularly given the grave constitutional problems on the merits.  According to a representation made by the Office of the Maryland Attorney General before the District Court in *Soderberg*, "there has never been a § 1-201 contempt proceeding against *anyone*." State's Mem. in Supp. of its Mot. to Dismiss, *Soderberg v. Pierson*, No. 19-cv-1559-RDB (D. Md. July 18, 2019) (Dkt. 23-1) at 8 (emphasis in original).  That being the case, the Broadcast Ban clearly does not address a pressing problem for the State of Maryland, as it has not sought to punish anyone in the nearly 40 years since the provision was enacted.  The State therefore will suffer no harm from "issuance of a preliminary injunction" preventing it from "enforcing [the Act's] restrictions." *Giovani Carandola*, 303 F.3d at 521; *see also Legend Night Club*, 637 F.3d at 302-03 (same); *Newsom*, 354 F.3d at 261

17

(same).  Indeed, "[i]f anything, the system is *improved* by such an injunction."  *Giovani*

*Carandola*, 303 F.3d at 521 (emphasis added).  On NPR's side of the scale, because this law

remains on the books and the Attorney General refuses to assure NPR that the state will not seek

sanctions against it, NPR faces the threat of punishment so long as the ban remains in effect.

Finally, with respect to the requirement that the preliminary injunction serve the public

interest, it cannot be seriously disputed that "upholding constitutional rights is in the public

interest."  *Legend Night Club*, 637 F.3d at 303; *see also Newsom*, 354 F.3d at 261 (same);

*Giovani Carandola,* 303 F.3d at 521 (same).  Here, protecting the constitutional rights of NPR

by enjoining the Broadcast Ban, which will in turn facilitate the broad dissemination of news

about one of the most significant criminal proceedings in Maryland history, is unquestionably in

the public interest.

Because all four factors weigh heavily in NPR's favor, this Court should issue a

preliminary injunction.[3]

---

[3] NPR also asks that no bond be required (or that only a nominal amount be set).  The
Court of Appeals has explained that "[w]here the district court determines that the risk of harm is
remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond
accordingly.  In some circumstances, a nominal bond may suffice."  *Hoechst Diafoil Co. v. Nan
Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999); *see also Pashby v. Delia*, 709 F.3d 307,
332 (4th Cir. 2013) ("the district court retains the discretion to set the bond amount as it sees fit
or waive the security requirement").  Waiving the bond requirement, or requiring the posting of
only a nominal amount in security, is appropriate here because, *inter alia*, issuance of an
injunction will cause no monetary damages to Defendants.  *See, e.g.*, *Planned Parenthood of
Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482, 501 (M.D.N.C. 2011) (issuing preliminary injunction
against state agency enjoining enforcement of law, and ruling that "[g]iven the lack of any
monetary injury to Defendant, no bond will be required"); *Hassay v. Mayor & City Council of
Ocean City, Md.*, 955 F. Supp. 2d 505, 527 (D. Md. 2013) (noting that "any costs suffered by
defendants during the period of the preliminary injunction will be minimal or nonexistent," and
requiring only "$1.00" in security); *Doe v. Pittsylvania Cnty., Va.*, 842 F. Supp. 2d 927, 937
(W.D. Va. 2012) (fixing "the amount of the security bond at zero dollars" because "the
prevailing law in this circuit makes it clear that it is highly likely that plaintiff will prevail on the
merits and there can be no monetary damages or other harm" to the defendant as a consequence
of issuing the preliminary injunction).

## CONCLUSION

For the reasons set forth above, NPR respectfully requests that this Court issue a preliminary injunction enjoining enforcement of the Broadcast Ban against NPR.

Dated: September 1, 2021          Respectfully submitted,

                                  BALLARD SPAHR LLP

                                  By:   */s/ Charles D. Tobin*
                                        Charles D. Tobin (Bar No. 15919)
                                        Maxwell S. Mishkin (Bar No. 20650)
                                        1909 K Street, NW, 12th Floor
                                        Washington, DC 20006
                                        Tel: 202.661.2200 | Fax: 202.661.2299
                                        tobinc@ballardspahr.com
                                        mishkinm@ballardspahr.com

                                        Leslie Minora (*pro hac vice* forthcoming)
                                        1735 Market Street, 51st Floor
                                        Philadelphia, PA 19103-7599
                                        Tel: 215.665.8500 | Fax: 215.864.8999
                                        minoral@ballardspahr.com

                                        *Attorneys for National Public Radio, Inc.*