**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATIONAL PUBLIC RADIO, INC.,   *

      *Plaintiff*,   *

      v.   *

              No. 21-cv-2247-RDB

HON. GLENN L. KLAVANS,   *

HON. FRED S. HECKER,   *

      *Defendants*.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PELIMINARY INJUNCTION**

    Defendants Glenn L. Klavans and Fred S. Hecker, by undersigned counsel, submit this response to Plaintiff's motion for preliminary injunction. The motion should be denied because Plaintiff National Public Radio, Inc. ("NPR") has failed to demonstrate the elements necessary to justify the extraordinary remedy of a preliminary injunction, particularly a mandatory preliminary injunction that would alter, rather than preserve, the status quo.

**BACKGROUND**

    NPR challenges application of § 1-201 of the Criminal Procedure Article, Annotated Code of Maryland, which prohibits "record[ing] or broadcast[ing] any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury," Md. Code Ann., Crim. Proc. § 1-201 (LexisNexis 2018), to prohibit it from

broadcasting recordings of criminal proceedings in the case of *State of Maryland v. Jarrod Ramos*, Case No. C-02—CR-18-001515.

### Maryland's Efforts to Protect Integrity of Criminal Trials

### Enactment of Crim. Proc. § 1-201

In November 1980, the Court of Appeals of Maryland issued a "Rules Order" suspending certain judicial ethics rules for 18 months to allow for a pilot program to "experiment" with "extended media coverage" of trial proceedings.  7 Md. Reg. 2252-55 (November 28, 1980), attached hereto as Exhibit 1.  Two of the seven judges declined to sign the order and a third filed a written dissent expressing concerns about the potential impact on witnesses and the resulting "adverse effect on the administration of justice."  *Id.* at 2253.  In accordance with the order, the Court adopted Rule 1209 which required written consent of all parties to any proceeding where extended media coverage was permitted and that such coverage "be conducted so as not to interfere with the right of any person to a fair and impartial trial[] and . . . the dignity and decorum which must attend the proceedings." Md. Rule 1209 (1983 Supp.), attached hereto as Exhibit 2.

Early the next year, the Supreme Court confronted Florida's televised trials in *Chandler v. Florida*, 449 U.S. 560 (1981).  The *Chandler* court recognized the "danger" that extended coverage of a trial "may adversely affect the conduct of the participants and the fairness of the trial, yet leave no evidence of how the conduct or the trial's fairness was affected."  *Chandler*, 449 U.S. at 577.  But the Court held that this inherent danger did not justify an "absolute constitutional ban on broadcast coverage." Instead, the Court permitted states to "experiment" in reaching an appropriate balance of interests.  *Id.* at 813.

2

In the 1981 legislative session, Maryland's General Assembly decided that the risk to trial fairness and integrity from broadcasting was too high and enacted what is now § 1-201 of the Criminal Procedure Article, Annotated Code of Maryland.[1]  Section 1-201 commands that, with certain exceptions, "a person may not record or broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury" and any person who violates this provision "may be held in contempt of court."    Md. Code Ann., Crim. Proc. § 1-201(c).[2]  The statute does not prohibit any person from describing, transcribing, or reenacting any portion of a criminal trial.  It bans only methods of communication that depict participants' images and voices from inside the courtroom.

Members of the public, however, may obtain copies of most court audio recordings or listen to and view video recordings at the courthouse.  Md. Rules 16-504(h), (i).  Copies of video recordings are provided only to judges, judicial and attorney ethics investigators, parties and their attorneys, or transcriptionists.  Md. Rule 16-504(i).  And no copies of recordings are provided when a proceeding is "closed pursuant to law," another rule provides for sealing or shielding, or "as ordered by the court."  Rule 16-504(h)(1).

---

[1] The statute was originally codified as Article 27, § 467B of the Maryland Code. 1981 Md. Laws ch. 748, at 2782.  The General Assembly then modified the text of § 1-201 "without substantive change" as part of a 2001 recodification of the Code.  2001 Md. Laws ch. 10, at 85-86.

[2] Unsuccessful bills seeking to amend the statute were introduced in the 2006-09, 2016-17, and 2019-20 legislative sessions.   Md. Fisc. Note, 2020 Sess. H.B. 1376.http://mgaleg.maryland.gov/2020RS/fnotes/bil_0006/hb1376.pdf   (last   visited September 3, 2021).

### Concerns for Integrity of Criminal Trials Persist

Since the passage of Crim. Law § 1-201, concerns about the potential for broadcasting to negatively impact criminal trials have persisted.  In 2008, after study and public hearings, the Maryland Judicial Conference Committee to Study Extended Media Coverage in Maryland determined that "the adverse impacts on the criminal justice process are real" and concluded unanimously that the current statutory prohibition on recording and broadcasting criminal trial courts should remain in effect.[3]  In support of this response to NPR's motion, defendants submit the declarations of two State's Attorneys documenting the continued need for Maryland's ban on the broadcasting of criminal trials.  *See* Declarations of Anne Colt Leitess and Scott D. Shellenberger, attached as Exhibits 3 and 4 respectively.

Anne Colt Leitess, State's Attorney for Anne Arundel County, Maryland, and a prosecutor with 33 years of experience, handled the prosecution of Jarrod Ramos for the mass shooting at the Capital Gazette newsroom.  Leitess Decl. ¶¶ 2, 3.  Ms. Leitess attests that the top challenge facing prosecutors is convincing victims and witnesses to violent crimes to appear in court and testify.  *Id.* ¶¶ 4-5.  Ms. Leitess routinely hears witnesses voice their concerns that the trial will be broadcast and that anyone will be able to see and

---

[3]https://www.courts.state.md.us/sites/default/files/import/publications/pdfs/mediac overagereport08.pdf (last visited September 3, 2021).

hear them testify. *Id.* ¶ 6. They fear returning to their communities and being labeled snitches. *Id.* ¶ 6. This fear is most greatly felt in cities such as Annapolis and Baltimore where witness intimidation is rampant and cooperation in homicide investigations is largely non-existent. *Id.* ¶ 6.

One of the most effective tools Ms. Leitess has at her disposal to secure witness cooperation is her ability to reassure them that there will be no cameras in the courtroom and that no one will be able to record their face or voice while they testify and play it on television or over the internet. *Id.* ¶ 8. Recording (other than by court personnel) and photography is forbidden in all Maryland courts and signs are posted on the courtroom doors, at the entrance to the courthouse, and stated by the judge during the case. *Id.* ¶ 8. This simple fact helps Ms. Leitess to persuade witnesses to come to court to testify. *Id.* ¶ 8.

Similarly, Scott D. Shellenberger, State's Attorney for Baltimore County, Maryland, with prosecutorial experience extending as far back as 1985, attests that over the last 35 years he has observed an increased reluctance of victims and witnesses to come to court to testify. Shellenberger Decl. ¶ 5. Prosecutors spend a great deal of time and energy trying to get witnesses to come to court and testify. *Id.* ¶ 5. Much of witnesses' reluctance is due to concerns for safety and possible retaliation for testifying against a criminal defendant. *Id.* ¶ 6. Both Mr. Shellenberger and Ms. Leitess attest that it is sometimes necessary to procure witness testimony by taking the witness into custody and bringing the witness involuntarily to court. *Id.* ¶ 6; Leitess Decl. ¶ 5. Based on his extensive experience, Mr. Shellenberger believes that permitting the broadcasting of

witness testimony over various media outlets or the internet will greatly increase witness reluctance thereby hampering prosecutors' ability to secure convictions and negatively impacting public safety. *Id.* ¶¶ 7-8.

**Soderberg v. Carrion**

In May 2019, nearly 40 years after the Maryland General Assembly enacted § 1-201, six plaintiffs, comprising of journalists and community-based organizers and organizations, sued two circuit court administrative judges seeking to invalidate the statute. *Soderberg v. Carrion*, 999 F.3d 962, 965 (4th Cir. 2021). The plaintiffs alleged that, for varying reasons, they wished to broadcast recordings they acquired from the Maryland courts in podcasts, documentaries, and at public meetings, and that a generalized fear of enforcement of the prohibition in § 1-201 had prevented them from using the recordings as they would like. *Id.* Plaintiffs claimed that § 1-201 is a restriction on speech that violates the First Amendment. *Id.* at 966.

Defendants moved to dismiss the complaint for failure to state a claim upon which relief may be granted on the theory that the statute was a content-neutral regulation of the time, place, and manner of speech that need only satisfy intermediate scrutiny. *Id.* at 966. After full briefing, this Court granted the motion and dismissed the complaint. *Id.* at 966-67. The plaintiffs appealed the dismissal, and the Court of Appeals for the Fourth Circuit accepted plaintiffs' argument that strict scrutiny rather than intermediate scrutiny should apply. *Id.* at 967. The Court of Appeals reversed and remanded the case to this Court for

consideration of whether the State can show that the statute is "narrowly tailored to a state interest of the highest order." *Id.* at 970 n. 4.  That litigation is ongoing.[4]

### State v. Ramos

On June 28, 2018, Jarrod Ramos entered the Capital Gazette newsroom in Annapolis, Maryland, and gunned down five newsroom employees.  Seven eyewitnesses testified in the criminal trial that followed.  Leitess Decl. ¶ 11.  One witness identified Ramos and described the attack in chilling detail.  *Id.* ¶ 11.  Six other witnesses were survivors of the attack who described Ramos's behavior in the newsroom, including him shooting co-workers and shooting at them while they ran for their lives.  *Id.*  The witnesses also described their extreme fear as they cowered under their desks waiting to die.  *Id.*  None of the witnesses have consented to have their voices and testimony broadcast over the airwaves.  *Id.* ¶ 12.  Based on her experience, State's Attorney Leitess believes that, had the witnesses known in advance that broadcasting was possible, "their testimony would have been sanitized and we would not have known that they prayed to die, how they suffer from PTSD, depression and are in therapy from this trauma, that they heard the dying

---

[4] On remand, this Court entered a scheduling order requiring the parties to submit supplemental briefing on the issue of whether the statute can survive strict scrutiny. *Soderberg, et al. v. Carrion, et al.*, Civil Action No. RDB-19-1559, ECF 46.  On September 1, 2021, the defendants filed a consent motion to amend the scheduling order to allow for the filing of an answer on the basis that making the required showing will involve the use of facts outside the pleadings and that granting the motion would give the parties the opportunity to proceed with discovery and brief the strict scrutiny question on summary judgment. *Soderberg* ECF 54.  This Court granted that motion on the same day. *Soderberg* ECF 55.

sounds and screams of their coworkers.  They would have been aware of the need to filter themselves."  *Id.*  The Ramos trial has now concluded.  Mr. Ramos is scheduled to be sentenced on September 28, 2021.  Compl. ¶ 25.

As NPR has noted, the criminal trial against Mr. Ramos was a notorious one, possibly "one of the most significant criminal proceedings in Maryland history."  ECF 3-1 at 5.  NPR asserts that it has lawfully obtained recordings of the criminal trial proceedings and intends to publish these recordings in an upcoming episode of its award-winning podcast, *Embedded*.  NPR understands that, pursuant to Crim. Proc. § 1-201(c), it can be held in contempt of court if it publishes the recordings as it intends.  NPR has sought declaratory and injunctive relief from this Court insulating it from any future contempt proceedings.

## ARGUMENT

### I.   LEGAL STANDARD

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances."  *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted); *see also Profiles, Inc. v. Bank of America*, 453 F. Supp. 3d 742, 747 (D. Md. 2020) (denying preliminary injunctive relief).  Further, given that the purpose of preliminary injunctions is to preserve the status quo during the pendency of litigation, injunctions that "alter rather that preserve the status quo," such as the one sought by NPR here, are particularly disfavored.  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,

915 F.3d 197, 216 n.8 (4th Cir. 2019).  Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Because a preliminary injunction is an extraordinary remedy, all four elements must be satisfied prior to the issuance of a preliminary injunction.  *Id.*  As set forth below, NPR has not satisfied any of the required elements.

## II.   NPR HAS NOT DEMONSTRATED IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

Although NPR is correct that application of Crim. Proc § 1-201 to its proposed broadcast must be analyzed under strict scrutiny, *Soderberg. v. Carrion*, 999 F.3d 962, 969 (2021), it has failed to establish that § 1-201 cannot withstand strict scrutiny.  To the contrary, the defendants are likely to demonstrate that § 1-201 is narrowly tailored to protect "'a state interest of the highest order.'"  *Id.* at 968 (quoting *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979)).

It cannot seriously be disputed that the fairness and integrity of criminal trials is a "state interest of the highest order."  Indeed, it is the bedrock of a just government.  *See Estes v. Texas*, 381 U.S. 532, 557-59 (1965) (tracing development of Anglo-American criminal trial "from a ritual practically devoid of rational justification to a fact-finding

9

process, the acknowledged purpose of which is to provide a fair and reliable determination of guilt") ("[T]he criminal trial under our Constitution has a clearly defined purpose, to provide a fair and reliable determination of guilt, and no procedure or occurrence which seriously threatens to divert it from that purpose can be tolerated.") (Warren, J. concurring); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) ("A fair trial in a fair tribunal is a basic requirement of due process.")   It is an interest embedded in the Sixth Amendment. *Estes*, 381 U.S. at 539-40.

Section 1-201 protects the fairness and integrity of Maryland's criminal trials by guarding against the harm to the trial process that would result from the distraction of jurors and intimidation of witnesses, if they knew that their participation in criminal trials might be broadcast on the news, *see id.* at 545-547, or disseminated worldwide via the internet and "available in perpetuity for unlimited viewing, further dissemination, and easy manipulation," *Mirlis v. Greer*, 952 F.3d 51, 56 (2d Cir. 2020).   Awareness that a proceeding may be broadcast may well affect witness testimony, demoralizing and frightening some while causing others to overdramatize.   *Estes*, 381 U.S. 547.   Such awareness may also "render witnesses reluctant to appear and thereby impede the trial as well as the discovery of truth."   *Id.*   Such dangers are not merely hypothetical.   State's Attorneys Leitess and Shellenberger have provided declarations that illustrate the real difficulties of procuring witness cooperation in criminal matters, particularly cases

involving violent crime, and the potential dangers to the integrity of the trial process of widely disseminating recordings of criminal trial proceedings.[5]

Section 1-201 is narrowly tailored to prevent the deleterious effect to witness testimony that is bound to develop if broadcasting of criminal trials were permitted. The prohibition is limited to criminal trials where Sixth Amendment interests are guaranteed; it does not extend to civil trials. The prohibition also is limited to proceedings in the trial court or before a grand jury where witness testimony will be taken; it does not extend to appellate proceedings where the record is static and only legal argument is presented. The prohibition places no restrictions on the dissemination of descriptions of what occurred at trial; it prevents only the dissemination of the actual recordings of the participants of trial. The media or other persons viewing the trial are free to describe what happened at trial, perform reenactments of trial, or publish transcripts of trial.

---

[5] NPR misses the mark when it argues that the broadcast ban cannot serve an important State interest because the State, in *Soderberg*, argued that the plaintiffs had no standing since no contempt proceedings have been brought for violation of Section 1-201 in the nearly 40 years since it was enacted. ECF 3-1 at 17. There is no record as to why there have been no contempt proceedings. It could be that the statute is working as intended. In any event, the Fourth Circuit made clear in *Ostergren v. Cuccinelli*, 615 F.3d 263, 277 (4th Cir. 2010) that a state's conduct is not dispositive of whether a law serves a compelling state interest in the First Amendment context. *Ostergren* rejected the district court's analysis of a Virginia law that limited the public disclosure of citizens' Social Security numbers based on the fact that Virginia made the same information available from another source, noting that in "deciding what constitutes a state interest of the highest order, courts cannot be bound by "the State's view and its conduct." *Id*. (citation omitted). Hence, the mere fact that a state's conduct may purportedly be inconsistent with its claim that a law serves an important interest is not conclusive.

Although NPR is correct that Supreme Court precedent disfavors punishment of truthful publication of publicly available information, *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495-96 (1975), there is no blanket prohibition on such restrictions.  Instead, the Supreme Court and Courts of Appeals have resolved each "ongoing conflict between privacy and the First Amendment 'only as it arose in a discrete factual context.'" *Ostergren v. Cuccinelli*, 615 F.3d 263, 276 (4th Cir. 2010) (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 530 (1989)).  Indeed, the Court of Appeals remanded the *Soderberg* case to this Court for just such analysis, and the parties have agreed to develop a factual record to enable to the Court to do so.

The Supreme Court has articulated three considerations that the *Cox Broadcasting* progeny have utilized to assist in the analysis when the conflict is between privacy interests and the First Amendment:  (1) to the extent sensitive information is in the government's custody, the government often may protect such information by "less drastic means" than punishing the publication of truthful information; (2) punishing the press for publication of information that already is publicly available is unlikely to advance the State's interest in the protection of privacy; and (3) such restrictions on publication may cause "timidity and self-censorship" by the press.  *Ostergren*, 615 F.3d at 275 (quoting *Florida Star*, 491 U.S. at 534-36).  Contrary to NPR's assertion, ECF 3-1 at 10-12, the application of these factors does not favor issuance of a preliminary injunction in this case because the protection of privacy is not the central State interest at stake in this case.  *See id*. at 281 (observing that cases involving State interests that diverge from the narrow privacy

interests considered in *Cox Broadcasting* and *Florida Star* require "a more nuanced analysis").

As to the first factor, although it is true the State could prevent the release of criminal trial recordings entirely, that method would be a greater restriction on First Amendment interests than the method selected by the State. The limited release of recordings to individuals permitted under § 1-201 and the Maryland Rules facilitates the public's access to court proceedings in a way that withholding recordings would not. Particularly in these days of court occupancy restrictions necessitated by ever-changing pandemic conditions, the State's method expands the size of the public courtroom giving media outlets like NPR access to the sights and sounds of the trial without having to send a journalist in person. Although the State could limit *in abstentia* access to written transcripts, that method would increase costs to the media for the production of transcripts and prevent journalists from hearing first-hand participants' speech quality and cadences—the very details that enable nuanced reporting.

As to the second factor, if the only matter at issue were the kind of narrow privacy interest at issue in *Florida Star*, NPR might have a point. *See Ostergren*, 614 F.3d at 281-82 (observing that *Cox Broadcasting* and *Florida Star* both involved very narrow conceptions of privacy—the protection of people from disclosure of embarrassing private facts—that is lost when such facts have been disclosed). Once released to the public, such information ceases to be private. *Id.* at 282 ("Because this conception of privacy presupposes secrecy, personal matters that have been publicly disclosed can no longer be considered private."). But privacy is not the central interest at play here. The central

interest—protecting the integrity and fairness of criminal trials—is not lost through the State's chosen method:   restricted release of official recordings of criminal trial proceedings coupled with a ban on broadcasting the trial-level proceedings.   As the Supreme Court has observed, "the very awareness . . . of the coverage and the contemplated broadcast may adversely affect the conduct of the participants and the fairness of the trial," but elude any potential remedy because it would "leave no evidence of how the conduct or the trial's fairness was affected."  *Chandler*, 449 U.S. at 577.  The State's chosen method avoids the potentially harmful effects of broad dissemination (perhaps into perpetuity) of voiceprints and images of the participants of a criminal trial.

As to the third factor, the statute does not invite timidity and self-censorship because the law is quite clear what is not permitted: broadcasting recordings from the criminal court proceedings.   Unlike the situation where the government, either purposefully or inadvertently, has released information that it then seeks to make confidential by sanctioning publication, the broadcasting ban does not "'force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication.'"   *Ostergren*, 615 F.3d at 275 (quoting *Florida Star*, 491 U.S. at 536).  Indeed, the parameters of the prohibition are clear as evidenced by NPR's lawsuit seeking relief from the prohibition.

## III.   THE BALANCE OF EQUITIES FAVORS DENIAL OF THE PRELIMINARY INJUNCTION.

Furthermore, granting the preliminary injunction is likely to cause more harm than denying it.  As NPR notes, the criminal trial it seeks to broadcast is "one of the most

14

significant criminal proceedings in Maryland history." ECF 3-1 at 5. The eyewitnesses of this horrific attack described in harrowing detail the gunning down of their coworkers, the attempted gunning down of themselves, and the trauma inflicted by their witnessing such events. Leitess Decl. ¶ 11. None of these witnesses have consented to have their voices and testimony broadcast over the airwaves or posted on the internet. *Id.* ¶ 12. Permitting NPR to broadcast the *Ramos* trial, and insulating it from the consequences provided in Maryland law, will undermine Maryland's compelling interest in prosecuting crimes and ensuring a fair and effective criminal trial process.

The undermining of Maryland's interest will occur at two levels. The broadcast has the potential to impact Mr. Ramos's criminal proceedings as they have not yet concluded. Mr. Ramos is scheduled to be sentenced on September 28, 2021. He will thereafter have the ability to appeal or seek other post-conviction relief. In the event he manages to procure another trial, any such trial could be impacted by the airing of his first trial. Moreover, given the notoriety of this case, there is a likely potential for negative impact on Maryland's criminal trial process generally. Witnesses will be aware that their in-court testimony can be broadcast. And the potential impact will be amplified far beyond what it would have been in 1981, the year Crim. Law § 1-201 was passed. In 1981, a recording might be broadcast once and then taken off the airways by court order. In 2021, given the internet and social media, it would be far more difficult, if not impossible, to contain. The *Ramos* in-court proceedings will be "available in perpetuity for unlimited viewing, further dissemination, and easy manipulation." *Mirlis*, 952 F.3d at 56.

By contrast, the harm to NPR and the listening public of denying the preliminary injunction will be negligible.  NPR could delay its broadcast until the conclusion of the merits of this case.  If it chooses to air its broadcast on schedule, it will be able to convey the contents of the *Ramos* trial through journalistic descriptions and re-enactments.  In the event it ultimately prevails in this case, it could supplement its broadcast with recordings of the criminal trial proceedings.  Although NPR provides an important function in our democratic society, the exercise of this function "must necessarily be subject to the maintenance of absolute fairness in the judicial process."  *Estes*, 381 U.S. at 539.

Finally, NPR seeks preliminary injunctive relief not to preserve the status quo during the pendency of this litigation, but rather to alter it.  Such mandatory preliminary injunctive relief is strongly disfavored.  *Mountain Valley Pipeline*, 915 F.3d at 216 n.8.  Hence, the balance of equities clearly favors denial of the preliminary injunction.

## IV.   NPR HAS NOT DEMONSTRATED THAT ISSUANCE OF THE PRELIMINARY INJUNCTION WILL PREVENT IRREPARABLE HARM.

NPR's motion also fails because it has failed to demonstrate irreparable harm.  As noted above, Section 1-201 does not prohibit NPR's use of the substance of the testimony given at the trial.  NPR is free to have reporters describe and quote from the recordings, read from the trial transcript and even use voice actors to re-enact the trial.  While NPR is correct that violations of First Amendment rights are presumed to cause irreparable harm, that principle does not apply in this case because NPR has not shown a First Amendment violation.  Accordingly, the cases cited by NPR in support of its argument that it will suffer irreparable harm are inapposite.

**V.**   **A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST.**

Finally, issuance of a preliminary injunction permitting NPR to broadcast audio from the *Ramos* trial is not in the public interest.  As discussed in detail above, such an order is likely to discourage witnesses from testifying in criminal trials, and therefore negatively affect public safety and undermine the integrity of Maryland's criminal trial process.  *Id*.  Further, such an order may well result in less, rather than more, public access to criminal trials.  If the broadcasting of criminal trial recordings is permitted, the State may well revert to prohibiting access of audio recordings of criminal trials to the public.  This would require the media and the public to pay for transcripts, resulting in less transparency, the opposite of what NPR claims it is seeking in this case.

## CONCLUSION

For all of the foregoing reasons, NPR's motion for a preliminary injunction should be denied.

Date: September 10, 2021                    Respectfully submitted,

                                           BRIAN E. FROSH
                                           Attorney General of Maryland

                                           /s/ Robert A. Scott

                                           _____
                                           ROBERT A, SCOTT (Bar No. 24613)
                                           ANN M. SHERIDAN  (Bar No. 11137)
                                           Assistant Attorneys General
                                           Office of the Attorney General
                                           200 St. Paul Place, 20th Floor
                                           Baltimore, Maryland 21202
                                           (410) 576-7055; (410) 576-6955 (fax)
                                           rscott@oag.state.md.us
                                           asheridan@oag.state.md.us

                                           Attorneys for Defendants