# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL PUBLIC RADIO, INC. | * | |
| *Plaintiff*, | * | |
| v. | * | No. 1:21-cv-2247 |
| GLENN L. KLAVANS, *et al.* | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF ANNE COLT LEITESS

Anne Colt Leitess hereby declares and affirms as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I currently serve as the State's Attorney for Anne Arundel County, Maryland. I have held this position since January 7, 2019, and previously served in this position from 2013-2015.

3. I have been a prosecutor for almost 33 years and specialize in trying victim-based crimes including homicide, child abuse and sexual assault. I prosecuted for 6 years in Baltimore City and 27 years in Anne Arundel County, Maryland. I have prosecuted dozens of homicides, including gang-ordered hits, several murders for hire, child homicides, and most recently, the mass shooting at the Capital Gazette newsroom on June 28, 2018 where five people were killed and 6 survived.

4.     The top challenge that prosecutors face is convincing victims and witnesses to violent crimes to appear in court and testify.  Based on my experience, many witnesses fear retribution by friends or family of defendants.  Based on my experience, eyewitnesses and fact witnesses are reluctant to provide even the most basic evidence to police, often refuse to be interviewed about the crime, and regularly avoid coming to court to testify.  It has become so difficult to find cooperating witnesses that some police agencies do not bother interviewing witnesses at a homicide scene until they first gather video and forensic evidence and then work from there to identify potential witnesses.

5.     Just last week, I needed to obtain court orders to have three witnesses appear to provide evidence in a homicide investigation.  All three had either refused to appear at all, or once they appeared, refused to answer any questions.  One of the witnesses chose to go to jail and was found in contempt of court rather than provide testimony.  None were eyewitnesses, only fact witnesses regarding a suspect's activities before and after the shooting.  Nevertheless, their fear of retribution by the suspect's friends and family was a significant factor in their reluctance to cooperate.

6.     Routinely, I hear witnesses voice their concern that the trial will be broadcast, and that anyone will be able to see and hear them testify.  They fear returning to their community and being labeled a snitch.  This fear is most greatly felt in the cities of Annapolis and Baltimore where witness intimidation is rampant and cooperation in homicide investigations is largely non-existent.

7.     As part of my goal to protect frightened and reluctant witnesses to violent crimes, I routinely request permission from the Court to shield their addresses from

disclosure to the defense. My office escorts witnesses and victims from the parking garage and brings them up to the courtroom via back stairwells to avoid them being seen. While I cannot completely protect their identities, I at least try to limit their public exposure. In the most dangerous cases, my office assists with witness relocation and moves entire families to a new town. In the city of Baltimore, there is an entire unit in the Office of the State's Attorney dedicated to witness relocation services with a large annual budget.

8. One of the best tools that I have is my ability to reassure a witness that there will be no cameras in the courtroom, and no one will be able to record their face or voice while they testify and play it on television or over the internet. After all, recording (other than by court personnel) and photography is forbidden in all Maryland courts and signs are posted on the courtroom doors, at the entrance to the courthouse, and stated by the judge during the case. This simple fact helps persuade witnesses to cooperate and come to court to testify.

9. While a defendant and citizens have the right to a public and open trial, there will undoubtedly be a chilling effect on those witnesses I need to call to identify a suspect or describe a violent, humiliating, and graphic attack they suffered if those witnesses are now subjected to having their recorded voices broadcast over radio, television or on the internet for all to hear.

10. Permitting witnesses recorded voices to be broadcast on radio, television or a podcast won't be any different than having a defendant's friend, family member or gang associate also obtain a copy of the hearing and play it over Instagram, Twitter or any other social media in order to identify the witness by name and voice, share it with others, and

then intimidate or harass a witness or his/her family members for cooperating with law enforcement and the prosecution.

11. In the case of *State of Maryland v. Jarrod Ramos,* C-02-CR-08-1515, there were seven eyewitnesses who testified about the gunman's attack. One was an identifying witness who pointed him out to police in a photograph and described the attack in chilling detail during his court testimony. The other six were survivors of the attack who described the gunman's specific behavior in the newsroom, including witnessing him shoot co-workers, point a gun at or shoot at them while they were running for their lives, and their extreme fear and distress as they cowered under their desks waiting to die. Many of these survivors were reluctant to testify, and only did so after much support and guidance.

12. It is important to note that none of the people who testified in court in the *State of Maryland vs Ramos* case have consented to have their voices and testimony broadcast over the airwaves. If they knew that this was going to happen, I have little doubt that it would have influenced how much they would have revealed on the stand. Based on my experience, I believe their testimony would have been sanitized and we would not have known that they prayed not to die, how they suffer from PTSD, depression and are in therapy from this trauma, that they heard the dying sounds and screams of their coworkers. They would have been aware of the need to filter themselves. This is a dangerous precedent for trial testimony of witnesses.

13. As an illustration of the potential danger of permitting a broadcast of witness testimony are the three recent cases I prosecuted involving the gang-ordered murder of John O'Sullivan that occurred at the Maryland Correctional Institute at Jessup. I tried the

*State of Maryland v. Vincent Bunner*, C-02-CR-18-517 and the *State of Maryland v. Calvin Lockner* C-02-CR-18-513 in January 2020 and then afterward, their co-defendant, Joseph Leissler in August 2021 in the case of *State of Maryland v. Joseph Leissler*, C-02-CR-18-515.

14. Joseph Leissler was the leader of the Aryan Brotherhood chapter in Maryland and ordered Vincent Bunner and Calvin Lockner to kill Mr. O'Sullivan, an elder in the rival gang, Dead Men Incorporated, in retaliation for a gang assault at another prison. The brutal stabbing murder committed by three men was captured on videotape. By the end of the police investigation, two cooperating witnesses came forward and identified the gang leader as the person who ordered the murder. It is only because of them that I was able to successfully prosecute all of those responsible.

15. During the trials, I called two former members of the Aryan Brotherhood to testify about the conspiracy and plan to murder the victim. At great risk to their own safety, these two men had renounced their gang affiliation, agreed to cooperate with law enforcement and the prosecution. As a result, they were required to live in protective custody for four and a half years in prison. Out of fear that they would be murdered before the trials took place, their identities, exact locations in prison, and all access to them was tightly controlled to prevent either corrupt prison guards or other gang members from harming or intimidating them. When they are transported or let outside for limited recreation time, their faces are covered for their safety.

16. During my trial preparation I met with the witnesses at their prison locations. Each of them separately remarked they had just seen me on television and heard me on the

radio regarding the *Ramos* case which I had tried just a month earlier. One had mentioned he even recognized the defendant when he had been at our local detention center when the witness was housed there during his testimony in the January 2020 trial. These conversations were revealing in that inmates, even in prison, keep track of other criminal trials, know about other criminal defendants, and learn about witness testimony by watching television and listening to the radio. Based on my experience, the idea that a witness' testimony in a gang-related homicide could be broadcast over radio, television or the internet, would greatly reduce the number of witnesses who are willing to testify in cases where it is needed most.

      17.     As an example of just how dangerous some trials can be for witnesses, during the January 2020 jury trial of *Bunner* and *Lockner,* intelligence officers discovered that gang members were discussing plans to attack the caravan transporting the various inmates on their way to court. One of the defendants obtained a pencil, a potential weapon, at the local detention center where he was housed overnight and secreted it on his person. It was discovered on him just before he came into the courtroom. During the trial, a suspected member of the Aryan Brotherhood entered the courtroom to watch the proceedings. During the August 2021 trial, a member of the Aryan Brotherhood and a member of Dead Men Incorporated were observed coming into the courtroom to watch the proceedings. During the trial, the defendant Joseph Leissler told the jury that he had ordered the murder of one of the testifying witnesses and his two co-defendants, saying that they were "in the hat" and slated for a hit by other members of the Aryan Brotherhood. This testimony, if

broadcast in his own voice, could also be used to communicate with other Aryan Brotherhood gang members to carry out his wishes and attack witnesses and others.

18. During the trial, more than seven members of the special operations group of the Maryland Division of Corrections stood guard in the courtroom in order to ensure the safety of courtroom personnel, witnesses, the judge and the attorneys. That level of protection is now over for these witnesses, who will remain incarcerated for many years to come. They are both under a death order from Aryan Brotherhood gang leader Joseph Leissler.

19. The testimony of these two cooperating prisoners, where they discuss the inner workings of the Aryan Brotherhood and hit to murder John O'Sullivan should not be rebroadcast in their own voices for others to hear. Doing so for the purpose of audience entertainment does not outweigh the danger that they face when their own words and voices are heard by other prisoners who have access to radio and television. They would be endangered if affiliated gang members outside of prison get to hear them. Likewise, based on my experience, it will chill the likelihood of witnesses such as them coming forward in the future if they know that their testimony could wind up on radio, television or the internet.

20. I believe that the public has a right to know about the specific testimony that witnesses give at trial. However, there is no need that the actual voices of witnesses be broadcast when doing so will have a chilling effect on witness cooperation. I need witnesses to come forward willingly and assist law enforcement during investigation and

trial. Permitting the use of a witness' voice for public broadcast will make it far more difficult to obtain that cooperation, and therefore have a negative effect on public safety.

    I hereby affirm, under the penalty of perjury, that the contents of the foregoing are true and correct.

9/2/2021
_____
Date

*Anne Colt Leitess*
_____
Anne Colt Leitess
State's Attorney for
Anne Arundel County