IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL PUBLIC RADIO, INC., | * | |
| Plaintiff, | * | |
| v. | * | |
| | | Civil Action No. RDB-21-2247 |
| HON. GLENN L. KLAVANS, *et al.*, | * | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

This case features an as-applied First Amendment challenge to Maryland's ban on the broadcast of any recordings of criminal proceedings held before a jury (the "Broadcast Ban"). Plaintiff National Public Radio, Inc. ("NPR") brings this action against the Honorable Glenn L. Klavans and the Honorable Fred S. Hecker, (collectively "Defendants"), two Maryland State Circuit Court Judges.[1] NPR seeks to enjoin the anticipated enforcement of the Broadcast Ban against a podcast episode featuring official state recordings of the recent trial of Jarrod Ramos, who was convicted of five murders in connection with the June 2018 Capital Gazette shooting in Annapolis, Maryland. Pending now is NPR's Motion for Preliminary Injunction (ECF No. 3). The parties' briefings have been reviewed, and a hearing was held on September 13, 2021. (ECF No. 14.) For the reasons set forth on the record at the hearing, and as supplemented by

---

[1] Judge Klavans is the Administrative Judge of the Circuit Court for Anne Arundel County and Judge Hecker is the Administrative Judge for the Fifth Judicial Circuit, which includes Anne Arundel County. (Compl., ECF No. 1 ¶¶ 8–9.)

this opinion, NPR's Motion for Preliminary Injunction has been GRANTED. (ECF No. 15.) A permanent injunction hearing has been scheduled for September 22, 2021. (*Id.*).

## BACKGROUND

### I. Access to Court Recordings in Maryland

Since 1980, Maryland court rules have required the verbatim recording of all state trial court proceedings, and provided the public a right to inspect or obtain copies of those records. (Compl., ECF No. 1 ¶¶ 13–15; Resp. in Opp., ECF No. 11, at 2.); *see* 7 Md. Reg. 2252-55 (Nov. 28, 1980) (authorizing pilot program for "extended media coverage" of criminal trials). Per the Maryland Rules, "[a]ll trials, hearings, testimony, and other judicial proceedings before a . . . judge held either in a courtroom or by remote electronic means shall be recorded verbatim in their entirety." Md. Rules, Rule 16-502 (District Court); Rule 16-503(a)(1) (Circuit Court). Members of the public may listen to or view trial recordings at the courthouse, Rule 16-504(i), or obtain official copies of the recordings on written request. Rule 16-504(h).

In 1981, the Maryland General Assembly enacted a law against the recording or broadcasting of criminal proceedings. (Resp. in Opp. 3.) Section 1-201 of the Criminal Procedure Article of the Maryland Code (the "Broadcast Ban") prohibits the use of any "television, radio, and photographic or recording equipment" to broadcast "any criminal matter . . . that is held in trial court or before a grand jury." Md. Code Ann., Crim. Proc. § 1-201(a). Violators "may be held in contempt of court." *Id.* § 1-201(c). The Broadcast Ban does not restrict the public access to court records provided in Rules 16-502, 16-503, and 16-504. Nor does it "prohibit any person from describing, transcribing, or reenacting any portion of a criminal trial." (Resp. in Opp. 3.)

## II.      NPR's Efforts to Broadcast the Trial of Jarrod Ramos

On June 28, 2018, Jarrod Ramos entered the Capital Gazette office in Annapolis and murdered 5 journalists in what the Pulitzer Prize Board has called "the largest killing of journalists in U.S. history." (Compl. ¶¶ 21–22.) The State charged Ramos with five counts of murder, one count of attempted murder, six counts of assault, and eleven counts of illegal use of a firearm. (*Id.* ¶ 23.) Ramos pleaded Guilty but Not Criminally Responsible to all twenty-three counts. (*Id.* ¶ 24.) His plea was rejected by a jury after a two-week trial in July 2021. (*Id.*) He is scheduled to be sentenced on September 28, 2021. (*Id.* ¶ 25.)

NPR is "the leading provider of non-commercial news, information, and entertainment programming to the American public." (*Id.* ¶ 7.) The network describes its work as "fact-based, independent journalism" that "helps the public stay on top of breaking news, follow the most critical stories of the day, and track complex issues over the long term." (*Id.* ¶ 7.) NPR distributes its broadcasts through over 1,000 non-commercial radio stations and reaches a weekly audience of sixty million Americans through multimedia audio and video content. (*Id.*) The NPR podcast *Embedded*, hosted by Kelly McEvers,[2] provides "deep-dive coverage" of ongoing news stories. (*Id.* ¶ 27.) An upcoming episode of *Embedded*, scheduled for release on or after September 30, 2021, will cover the Jarrod Ramos murders and his subsequent trial. (*Id.* ¶¶ 28–30.) As part of this episode and related radio broadcasts, NPR intends to publish excerpts of the audio from the trial court proceedings, lawfully obtained pursuant to Maryland Rule 16-504(h)(1). (*Id.*)

---

[2] Kelly McEvers is a two-time Peabody Award-winning journalist and the former host of *All Things Considered*. (*Id.* ¶ 27.)

3

NPR is concerned that its upcoming coverage of the Ramos trial will subject it to criminal sanctions under the Broadcast Ban. Following the opinion of the United States Court of Appeals for the Fourth Circuit in *Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021),[3] NPR sent a letter to the Office of the Attorney General on August 23, 2021, to "respectfully request that the State commit not to seek sanctions against NPR" under the Broadcast Ban for broadcasting official recordings of the Ramos trial. (*Id.* ¶ 34.) On August 31, the Office of the Attorney General responded by letter, declining "to commit in advance to take enforcement action for a hypothetical violation of the law that has not yet occurred." (*Id.* ¶ 35.) NPR filed its Complaint and Motion for Preliminary Injunction on September 1, 2021, seeking a declaration that the Broadcast Ban is unconstitutional as applied to NPR, and both preliminary and permanent injunctive relief against its enforcement. (*Id.* ¶ 6; *see also* Mot. for Preliminary Injunction, ECF No. 3.)

## STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching

---

[3] In *Soderberg*, a collection of journalists, organizers, and criminal justice advocacy organizations brought "a facial, pre-enforcement challenge" against the Broadcast Ban under the First and Fourteenth Amendments. 999 F.3d at 966; *see also Soderberg v. Pierson*, No. RDB-19-1559, 2020 WL 206619 (D. Md. Jan. 14, 2020) (lower court opinion). This Court dismissed the complaint, holding that the Broadcast Ban "constitutes a content-neutral regulation of the time, place, and manner of speech that survives intermediate scrutiny." *Soderberg*, 999 F.3d at 964. When the plaintiffs appealed, the United States Court of Appeals for the Fourth Circuit vacated and remanded, construing the Ban as "a penal sanction for publishing information released to the public in official court records," and holding that it is subject to strict scrutiny. *Id.* at 964, 969. *Soderberg* remains pending before this Court on remand.

power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). "[M]andatory preliminary injunctions—those that alter rather than preserve the status quo—are disfavored," and should only be granted where "the applicants' right to relief [is] indisputably clear." *Mtn. Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019).

In determining whether to issue a preliminary injunction, the Court must follow the test set forth by the Supreme Court in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors the movant; and (4) an injunction is in the public interest. 555 U.S. at 20; *accord Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 236 (4th Cir. 2014).

The movant must show more than a "grave or serious question for litigation;" instead, it bears the "heavy burden" of making a "clear showing that [it] is likely to succeed at trial on the merits." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009); *see also Int'l Brotherhood of Teamsters v. Airgas, Inc.*, 239 F. Supp. 3d 906, 912 (D. Md. 2017) ("Because a preliminary injunction is 'an extraordinary remedy,' it 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" (quoting *Winter*, 555 U.S. at 22)). Still, an injunction "is not granted as a matter of course, and whether to grant the injunction still remains in the equitable discretion of the [district] court even when a plaintiff has made the requisite showing." *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) (internal citations omitted).

## ANALYSIS

In *Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021), the United States Court of Appeals for the Fourth Circuit held that the Maryland Broadcast Ban "is properly assessed as a penal sanction for publishing information released to the public in official court records," and is subject to strict scrutiny.[4] 999 F.3d at 964. The parties center their arguments on the first prong of the *Winter* analysis, analyzing whether the challenged application of the Broadcast Ban can survive this demanding test. (Mem. in Supp., ECF No. 3-1 at 12–16; Resp. in Opp. 9–14.) On the facts of this case, the state's asserted interests in witness protection and trial fairness are too speculative—and its solution too loosely tailored—to justify prohibiting NPR's broadcast of the Ramos trial. Accordingly, Plaintiff's request for a preliminary injunction will be granted, and a permanent injunction hearing will be scheduled.

### I. NPR has made a clear showing that it is likely to succeed on the merits.

To obtain a preliminary injunction, NPR must make "a clear showing" that it is likely to succeed on the merits of its constitutional challenge. *Winter*, 555 U.S. at 22. "As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quotation omitted). The Supreme Court has repeatedly held that "'if a [news organization] lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.'" *Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989) (quotation omitted); *see, e.g.*, *Bartnicki*,

---

[4] As discussed *supra*, the *Soderberg* case has been remanded and is once again pending before this Court.

532 U.S. at 528; *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979); *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 837–39 (1978); *Oklahoma Publishing Co. v. Oklahoma Cnty Dist. Ct.*, 430 U.S. 308, 310 (1977); *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 496 (1975). As the Maryland Broadcast Ban "is properly assessed as a penal sanction for publishing information released to the public in official court records," it is subject to strict scrutiny, and must be "narrowly tailored to a state interest of the highest order" to survive constitutional muster. *Soderberg*, 999 F.3d at 964.

Under the First Amendment, strict scrutiny "'requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)); *accord Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 798 (1988). NPR exclusively raises an as-applied challenge to the Ban. (Compl. ¶ 46)[5] Accordingly, the Defendants must show that the application of the Broadcast Ban to NPR's podcast survives strict scrutiny—not that the Ban will be justified by a compelling interest in other, hypothetical circumstances. *Cf. Educational Media Co. v. Insley*, 731 F.3d at 298 n.5

---

[5] "The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry," *Educational Media Co. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (citation omitted), and "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 331 (2010). "The substantive rule of law is the same for both challenges." *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *accord Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). "To succeed in a facial constitutional challenge, a movant 'must establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "To prevail on an as-applied . . . challenge, [a plaintiff] must show that the regulations are unconstitutional as applied to their particular speech activity." *Edwards*, 755 F.3d at 1001. "[A] court considering a facial challenge is to assess the constitutionality of the challenged law 'without regard to its impact on the plaintiff asserting the facial challenge,'" while "an as-applied challenge is 'based on a developed factual record and the application of a statute to a specific person." *Insley*, 731 F.3d at 298 n.5 (quotation and alterations omitted). Accordingly, as-applied challenges are fact-specific, and categorically easier to mount. *See Hosford*, 843 F.3d at 165.

(holding that an as-applied challenge turns "'on a developed factual record and the application of a statute to a specific person'"). At this stage in the litigation, Defendants fail to make this showing.[6]

A. *Compelling Interest*

To succeed on the first prong of strict scrutiny, Defendants must show that applying the Broadcast Ban to NPR's upcoming podcast advances a "state interest of the highest order." *Soderberg*, 999 F.3d at 968–69. "In deciding what constitutes a state interest of the highest order, courts cannot be bound by 'the State's view and its conduct,'" and should consider "objective criteria." *Ostergren v. Cuccinelli*, 615 F.3d 263, 277 (4th Cir. 2010). "The Supreme Court has made clear that, when free speech values are at stake, states must supply rationales that are 'far stronger than mere speculation about serious harms.'" *Wash. Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019) (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 531 (2001)). This principle is essential in an as-applied challenge, where the State must justify its restraints on expression "based on a developed factual record and the application of a statute to a specific person," rather than abstract harms that could emerge in future cases. *See Edwards*, 755 F.3d at 1001; *Insley*, 731 F.3d at 298 n.5.

In *Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019), the United States Court of Appeals for the Fourth Circuit applied strict scrutiny to disclosure and recordkeeping requirements regulating paid online advertising following the 2016 election. 944 F.3d at 510–

---

[6] There is no serious contention that NPR does not seek to publish "lawfully obtain[ed,] truthful information about a matter of public significance." *Fla. Star*, 491 U.S. at 533. The episode of *Embedded* at issue will feature excerpts of "official court recordings" of the Ramos trial, "lawfully obtained pursuant to Maryland Rule 16-504(h)(1)." (Mem. in Supp. 8.) As both parties recognize, this trial may be "one of the most significant criminal proceedings in Maryland history." (*Id.* at 5; Resp. in Opp. 8.)

12. To defend its challenged law, the State insisted that these requirements were necessary to combat "pervasive attempts by foreign nationals to influence American elections." *Id.* at 511. Acknowledging the lack of evidence of interference through paid advertisements, the State advanced a "prophylactic rationale," insisting it "was not required to wait for foreign-sourced ads to appear via a particular method on plaintiffs' websites before acting prophylactically to prevent such misconduct." *Id.* at 521.

The Fourth Circuit rejected this argument, observing that the law "burdens too much and furthers too little." *Id.* at 523. As an initial matter, the law did "surprisingly little" to achieve its stated objective: Where the law targeted paid content, the State itself acknowledged that "Russian influence [in the 2016 election] was achieved 'primarily through unpaid posts' on social media." *Id.* at 521. Moreover, the Court held that a "preventative justification fails to pass First Amendment muster," reasoning that:

> The Supreme Court has made clear that, when free speech values are at stake, states must supply rationales that are 'far stronger than mere speculation about serious harms.' The First Amendment does not permit states to broadly conjure hypotheticals in support of expressive burdens. If any evidence—no matter how indirect or futuristic—could concretize a purported harm, speech would be rendered substantially more vulnerable.

944 F.3d at 506 (citations omitted). As the State failed to identify even "'a single foreign-sourced paid political ad that ran on a news site, be it in 2016 or at any other time,'" its abstract concerns about election interference could not overcome strict scrutiny. *Id.* at 521 (quotation omitted); *see also, e.g.*, *Bartinicki*, 532 U.S. at 529–30.

In the case at bar, Defendants insist that the Broadcast Ban is necessary to preserve the fairness and integrity of criminal trials, a "bedrock of just government." (Resp. in Opp. 9–10.) This unequivocally qualifies as "a state interest of the highest order." *See, e.g.*, *Nebraska Press*

*Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) ("A fair trial in a fair tribunal is a basic requirement of due process."); *Estes v. Texas*, 381 U.S. 532, 539 (1965) ("While maximum freedom must be allowed the press . . . its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process."). Defendants insist that allowing NPR to publish will send a message to witnesses that anything they say in court will be perpetually memorialized online—demoralizing witnesses and heightening the risk of retaliation or intimidation. (Resp. in Opp. 10–11.) *Cf. Mirlis v. Greer*, 952 F.3d 51, 56 (2d Cir. 2020) ("Today . . . videos of all types are routinely and widely shared on the Internet, where . . . it appears they will be available in perpetuity for unlimited viewing, further dissemination, and easy manipulation."). Defendants buttress this argument with two declarations by State's Attorneys attesting to the difficulties of procuring witness cooperation in criminal cases. (Resp. in Opp. 10–11; Decl. of Anne Colt Leitess, ECF No. 11-3; Decl. of Scott Shellenberger, ECF No. 11-4.)

However, Defendants' asserted interest is prophylactic at best, and speculative at worst. To overcome NPR's as-applied challenge, Defendants must justify the application of the Broadcast Ban on the "developed factual record" in this case—not on abstract, future cases. *Insley*, 731 F.3d at 298 n.5 (citation omitted). Nothing on the record suggests NPR's podcast will endanger witnesses or undermine the fairness of the proceedings against Jarrod Ramos—whose trial is concluded, whose sentencing is imminent, and whose potential appeal will not require witness participation. Absent such evidence, Defendants' concern about chilling future cooperation echoes the prophylaxis rejected in *McManus*—a "mere speculation about serious harms" that is insufficient to survive strict scrutiny, particularly on an as-applied challenge. *Cf. McManus*, 944 F.3d at 506 (citation omitted).

As applied here, the Ban also does "surprisingly little" to achieve its goal. *Cf. Id.* at 520. As the Defendants themselves note, NPR "is free to have reporters describe and quote from the recordings, read from the trial transcript, and even use voice actors to re-enact the trial," notwithstanding the Broadcast Ban. (Resp. in Opp. 16.) Additionally, since well before the advent of broadcast media, witnesses who cooperate with the government have risked intimidation and retaliation by a criminal defendant's associates.[7] Just as a restriction on paid advertisements cannot meaningfully counteract foreign influence through unpaid channels, it is unclear how prohibiting NPR from broadcasting trial recordings will meaningfully advance Maryland's interest in protecting witnesses when alternative means of disclosure are available and create the same generalized risks of exposure. Without specific evidence that NPR's broadcast would endanger witnesses or undermine the fairness or security of the Ramos trial, Defendants' assertion that applying the Broadcast Ban in this case would advance "a state interest of the highest order" is tenuous at best.

B. *Narrow Tailoring*

To satisfy the "narrow tailoring" prong of strict scrutiny, "the State must do more than assert a compelling state interest—it must [also] demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). "'[W]hen [laws] affect First

---

[7] To the extent that the State is concerned about witness intimidation, the Supreme Court has emphasized that ordinary criminal sanctions are a more appropriate mechanism for deterring this misconduct. *See Vopper*, 532 U.S. at 529 ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court held that a wiretap statute could not be constitutionally applied to newspapers who published excerpts of a conversation that were illegally recorded by an unknown party. 532 U.S. at 519–22. Rejecting the Government's argument that the statute was necessary to deter illegal recordings, the Court held that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Id.* at 529.

11

Amendment rights, they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive.'" *Greater Balt. Ctr for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 879 F.3d 101, 112 (4th Cir. 2018) (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 805 (2011)) (alterations in original). "With respect to narrow tailoring, [courts] require the government to prove that no 'less restrictive alternative' would serve its purpose." *Central Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016); *accord Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."). Applying this standard, the weight of Supreme Court precedent suggests that applying the Broadcast Ban to NPR's podcast would not be narrowly tailored to the Defendants' stated objectives.

As discussed above, Defendants insist that restricting the broadcast of trial recordings is necessary to advance Maryland's compelling interest in the integrity of criminal trials—and that allowing NPR to publish its podcast will have damaging effects on the system as a whole. (Resp. in Opp. 10–11.) This claim is unpersuasive, as public scrutiny of trials is preservative—not deleterious—of fairness. *See, e.g.*, *Cox Broadcasting*, 420 U.S. at 492 ("[T]he function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."); *Press-Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 508 (1984) ("Openness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."); *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 607 (1982) ("Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process."); *Chandler v. Florida*, 449 U.S. 560, 574–75 (1981) ("The risk of juror prejudice in some cases does not justify an absolute ban . . . on

all broadcast coverage."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 574 (1980) ("[A] presumption of openness inheres in the very nature of a criminal trial under our system of justice."). Although the Broadcast Ban does not close the courtroom doors, these bedrock principles run counter to Defendants' assertion that broadcast coverage of trial proceedings will broadly undermine the fairness of Maryland's judicial system.

More narrowly, the thrust of Defendants' argument is that broadcasting trial recordings will expose witnesses to retaliation and deter future cooperation with the government. (Resp. in Opp. 10.) These are undeniably pressing concerns that may well be manifest in other cases. *See, e.g.*, *Globe Newspaper Co.*, 457 U.S. at 606–08 ("Although the right of access to criminal trials is of constitutional stature, it is not absolute."); *Crowe v. County of San Diego*, 210 F. Supp. 2d 1189, 1194 (S.D. Cal. 2004) (reasoning that the presumption of open judicial proceedings "is qualified," and may be overcome by a criminal defendant's constitutional right to a fair trial). However, this is an as-applied challenge.[8] In cases featuring evidence of witness intimidation, harassment, or other serious safety and fairness concerns, the Broadcasting Ban may well be "narrowly tailored" to protect witnesses and preserve the integrity of criminal proceedings. Where, as here, the record is devoid of evidence that a broadcast would endanger witnesses or implicate the fairness of a criminal trial, the Broadcast Ban is not "necessary" to achieve Defendants' stated objectives. *Florida Star*, 491 U.S. at 538.

---

[8] "To succeed in a facial constitutional challenge, a movant 'must establish that no set of circumstances exists under which the Act would be valid.'" *Hosford*, 843 F.3d at 165 (quoting *Salerno*, 481 U.S. at 745). As indicated throughout this opinion, the Broadcast Ban's facial constitutionality is not at issue in the present case. Such questions may be addressed in the *Soderberg* litigation, now before this Court on remand. *See Soderberg*, 999 F.3d at 966 (describing pending case as "a facial, pre-enforcement challenge" against the Ban).

Defendants respond that none of the witnesses in the Jarrod Ramos trial consented to the broadcast of their testimony. (Resp. in Opp. 14.)[9] This bare interest in witness privacy is insufficient to outweigh "the public interest in a vigorous press" or "[t]he special protected nature of accurate reports of judicial proceedings." *Cox Broadcasting Co.*, 420 U.S. at 492, 495. As the Supreme Court held in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989), "where the government itself provides information to the media . . . the government retains ample means of safeguarding significant interests upon which publication may impinge." 491 U.S. at 534. Specifically:

> To the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition. . . . To the extent sensitive information is in the government's custody, it has [great] power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination.

*Id.* (citing *Landmark Comm'ns, Inc.*, 435 U.S. at 845; *Oklahoma Publishing Co.*, 430 U.S. at 311; *Cox Broadcasting Co.*, 420 U.S. at 496).[10] Given the availability of these alternatives, "[penalizing the press] can hardly be said to be a narrowly tailored means of safeguarding anonymity." *Id.* at 538.

---

[9] Defendants further insist that the State's only available alternative would be to "revert to prohibiting access of audio recordings of criminal trials to the public"—further restricting First Amendment rights and undermining the public interest in trial disclosure. (Resp. in Opp. 16.) This argument is speculative, as the record is devoid of evidence suggesting that the State would respond in this manner. It is also irrelevant to this case, as the facial constitutionality of the Broadcast Ban is not at issue.

[10] The Court also observed that "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act," and that "'timidity and self-censorship' . . . may result from allowing the media to be punished for publishing certain truthful information." *Id.* at 535.

14

If Maryland is concerned about the privacy issues raised by nonconsensual broadcasts of witness testimony, the State retains ample alternative means of protecting those interests. Absent evidence of concrete concerns for witness safety or fairness on the facts of this case, Defendants cannot justify prohibiting NPR from broadcasting information obtained "from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection." *Cox Broadcasting Co.*, 420 U.S. at 495 ("[I]nterests in privacy fade when the information involved already appears on the public record."). Accordingly, Defendants appear unlikely to overcome the rigorous strict scrutiny standard—and NPR is likely to succeed on the merits of its constitutional claim.

**II. The equitable factors favor granting a preliminary injunction.**

As NPR is likely to succeed on its First Amendment challenge, irreparable harm and public interest favor an injunction. "[A] party seeking a preliminary injunction must prove that he or she is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013). "[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *Rossignol v. Voorhar*, 316 F.3d 516, 522 (4th Cir. 2003). Concurrently, it is unequivocal that "the public interest favors protecting constitutional rights." *See, e.g., Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *accord Legend Night Club*, 637 F.3d at 302; *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002). Absent a preliminary injunction,

15

NPR may only release its podcast beneath the lingering specter of a criminal contempt proceeding. This chilling effect establishes irreparable injury as a matter of law, and invokes the well-settled public interest in the freedom of expression. *Cf. Real Truth About Obama, Inc.*, 575 F.3d at 351 ("[C]hilling speech constitutes irreparable injury."); *Leaders of a Beautiful Struggle*, 2 F.4th at 346.

The balance of equities also favors NPR. As established above, NPR has built a strong case for a violation of its First Amendment rights. Comparatively, as NPR observes, and as Defendants admit, "there has never been a § 1-201 contempt proceeding against anyone." (Mem. in Supp. 17–18; Resp. in Opp. 11.) This comprehensive lack of enforcement suggests that Maryland will not be harmed by NPR's requested injunction. (Mem. in Supp. 17–18.) The Defendants raise only speculative concerns in response to this argument, reiterating their claim that NPR's broadcast "will undermine Maryland's interest in prosecuting crimes and ensuring a fair and effective criminal trial process." (Resp. in Opp. 11.) But the record is devoid of facts suggesting those concerns are manifest here. Absent such evidence, "the balance of equities tips decisively in NPR's favor." (Mem. in Supp. 17). Maryland's interests in applying a never-enforced law in a case based on hypothetical fairness concerns does not outweigh NPR's well-established and tangible interest in its constitutional rights.

## CONCLUSION

For the reasons stated above, and set forth on the record, Plaintiff's Motion for Preliminary Injunction (ECF No. 2) was GRANTED at the September 13, 2021 hearing. (ECF No. 15.) The requested Preliminary Injunction was issued, and a permanent injunction hearing was scheduled for September 22, 2021, at 11:00 AM.

Dated: September 15, 2021.

                                              _____/s/_____
                                              Richard D. Bennett
                                              United States District Judge